IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.

AMIN BOYD,

*Defendant*.

Criminal Action No. ELH-19-0286

## MEMORANDUM OPINION

Defendant Amin Boyd entered a plea of guilty in September 2020 to the offense of conspiracy to distribute and possess with intent to distribute controlled substances. ECF 688. On December 8, 2020, the Court sentenced Boyd to 84 months of imprisonment, with credit for time served since July 8, 2019. ECF 817 (Judgment). Boyd, who is now self-represented, has filed a motion for compassionate release (ECF 1278, the "Motion"), supported by an exhibit. ECF 1278-1.[1] The government opposes the Motion (ECF 1302, the "Opposition"), supported by several exhibits. ECF 1302-2 to ECF 1302-5. Boyd replied. ECF 1316 (the "Reply").

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall deny the Motion, without prejudice.

### I.   Background

On June 11, 2019, Boyd and twenty-four codefendants were charged in a thirty count Superseding Indictment. ECF 96. Of relevance here, Boyd was charged with conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. §

---

[1] The Office of the Federal Public Defender advised the Court that it would not supplement Boyd's pro se filing. ECF 1300.

846 (Count One).  Pursuant to a Plea Agreement (ECF 688), Boyd entered a plea of guilty on September 8, 2020, to Count One of the Superseding Indictment.  ECF 686.  Notably, the Plea Agreement was tendered under Fed. R. Crim. P. 11(c)(1)(C), by which the parties agreed to a sentence of 84 months of imprisonment.  ECF 688, ¶ 10.

According to the Stipulated Statement of Facts in the Plea Agreement, in July of 2018, the Drug Enforcement Administration ("DEA") began a drug-trafficking investigation of the Monument Street corridor in east Baltimore.  *Id.* at 9.  During the investigation, the DEA identified Boyd as a wholesale drug customer of members of a conspiracy to distribute controlled substances. The parties agreed that, during the course of and in furtherance of the conspiracy, it was reasonably foreseeable to Boyd that he and other members of the conspiracy would distribute at least 500 grams but less than two kilograms of cocaine, as well as quantities of cocaine base, heroin, and fentanyl.  Additionally, investigators intercepted multiple phone calls and other electronic communication between Boyd and other members of the conspiracy "during which they discussed narcotic transactions methods of making cocaine into crack cocaine."  *Id.*

By statute, Count One carries a maximum penalty of twenty years of imprisonment.  *Id.* ¶ 3.  The parties agreed to a base offense level of 24 under the United States Sentencing Guidelines ("U.S.S.G" or "Guidelines").  The parties also contemplated a three-level reduction for acceptance of responsibility under U.S.S.G. 3E1.1.  As a result, the Plea Agreement contemplated a final offense level of 21.  *Id.* ¶ 6(b).  The calculations in the Presentence Report (ECF 788, "PSR") are consistent with the Plea Agreement.  *Id.* ¶¶ 14-23.

Sentencing was held on December 8, 2020.  At the time of sentencing, Boyd was 42 years old.  *Id.* at 2.  He stood six feet, three inches tall and weighed 244 pounds.  *Id*. ¶ 66.  The PSR noted that he is prescribed medication for high blood pressure.  *Id.*

Further, the PSR reflects that Boyd had sixteen prior adult criminal convictions in Maryland, of which eight scored points.  In particular, in 2002, at the age of 24, Boyd obtained two felony drug convictions (ECF 788, ¶¶ 30, 33) and one conviction for possession of cocaine. *Id*. ¶ 32.  Boyd was convicted of distribution of cocaine in 2003 (*id.* ¶ 34) and in 2004 he was convicted of possession with intent to distribute cocaine.  *Id.* ¶ 36.  In 2006, Boyd was convicted of possession with intent to distribute marijuana.  *Id.* ¶ 37.  Then, in 2018, he was again convicted of possession with intent to distribute cocaine.  *Id.* ¶ 43.

Boyd's criminal history yielded a subtotal criminal history score of 18 points.  *Id.* ¶ 44.  Two points were added because, at the time of the instant offense, Boyd was on probation.  *Id.* ¶ 45.  Thus, Boyd had a total of 20 criminal history points, yielding a criminal history category of VI.  *Id.* ¶ 46.

With a final offense level of 20 and a criminal history category of VI, the Guidelines for Count One called for a period of incarceration ranging from 77 to 96 months.  *Id*. ¶ 78.  As noted, the Court imposed the agreed upon sentence of 84 months of incarceration, in accordance with the terms of the C plea.  ECF 817.  The Court also imposed a term of three years of supervised release. *Id*.  No appeal was taken by the defendant.

Boyd is currently incarcerated at FCI Cumberland.  *Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited November 9, 2022).  The Bureau of Prisons ("BOP") indicates that he has a projected release date of July 20, 2025.  With credit for pretrial detention dating from July 8, 2019, Boyd has served about 40 months of his 84-month sentence, or approximately 50% of his sentence.

On September 14, 2021, having served less than a year of his imposed sentence, Boyd filed a pro se motion for compassionate release, arguing that he is at risk for severe illness from COVID-

19 due to his physical health.  ECF 1278.  In particular, he asserts that he "suffers from high blood pressure, diabetes and obesity."  *Id.* at 1.  Further, he complains that F.C.I. Cumberland "has been derelict in it's [sic] duty to protect vulnerable inmates" from COVID-19.  ECF 1278 at 2.  And, he asserts that the conditions at the institution "are cramped," making it "impossible to practice social distancing . . . ."  *Id.* at 3.  In addition, Boyd asserts that he "has a remarkable record of rehabilitation" and "has been a role model prisoner."  *Id.*  And, he claims to have "a solid release plan."  *Id.* at 4.

The government concedes that Boyd's medical conditions confer threshold eligibility for compassionate release.  ECF 1302 at 21.  But, it argues that defendant "does not present an 'extraordinary and compelling reason' because he has been vaccinated."  *Id.* at 24.  According to defendant's medical records, Boyd received his second dose of the Moderna vaccine on September 10, 2021.  ECF 1302-5 at 124, 125.  Further, the government notes that Boyd has already contracted COVID-19 and recovered from it, without significant consequence.  *Id.* at 31; *see* ECF 1302-5 at 35.  And, in any event, the government argues that the balance of the sentencing factors in 18 U.S.C. § 3553(a) supports a denial of relief.  ECF 1302 at 33-36.

Boyd filed an administrative request for compassionate release (ECF 1302-3), which was denied by the Warden of FCI Cumberland on April 21, 2021.  ECF 1302-4.  The government does not contest that Boyd has exhausted his administrative remedies.  ECF 1302 at 3.

Additional facts are included, *infra*.

## II.      Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395

(4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i); *see United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022).  This provision is an exception to the ordinary rule of finality. *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. No. 115-391, 132 Stat. 5194 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).  As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a

court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. (Emphasis added). So, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, the defendant may petition a court directly for compassionate release. *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276. This constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) [of 18 U.S.C.] to the extent that they are applicable," it finds:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021); *see also Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the court must find that (1) "extraordinary and compelling reasons" warrant a reduction of the sentence; (2) the sentence reduction is "consistent" with applicable policy statements issued by the Sentencing

Commission; and (3) on balance, the factors set forth in 18 U.S.C. § 3553(a) warrant a reduction of sentence.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169. But, the Fourth Circuit has said: "When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release. *See McCoy,* 981 F.3d at 276-77.[2] In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "Other Reasons," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the

---

[2] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C). *See McCoy,* 981 F.3d at 276.

defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act. *McCoy*, 981 F.3d at 276. Of significance here, it is only "directed at BOP requests for sentence reductions." *Id.* (citing U.S.S.G. § 1B1.13). Thus, "[b]y its plain terms. . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. And, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to the defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to [U.S.S.G.] § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also United States v. Brice*, ___ F. App'x ___, 2022 WL 3715086, at *1 (4th Cir. Aug. 29, 2022) (per curiam); *Hargrove*, 30 F.4th at 194-95. Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily

summarized." *Hargrove*, 30 F.4th at 197.   Notably, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam).   Nevertheless, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at *1; 28 U.S.C. § 994(t).   And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'" *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).

Moreover, the Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c).   *Jenkins*, 22 F.4th at 169.   However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.

Of relevance here, the Supreme Court decided *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389 (2022), on June 27, 2022.   In that case, the Supreme Court ruled, in the context of § 404(b) of the First Step Act, that, when raised by the parties, the district court is obligated to consider intervening changes in the law and factual developments. *Id.* at 2396; *see Brice*, 2022 WL 3715086, at *2.

In sum, there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release. Nevertheless, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194.   And, as mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for

9

release'" raised by a defendant.  *McCoy*, 981 F.3d at 284 (citation omitted); *see Concepcion*, 142 S. Ct. at 2396; *Jenkins*, 22 F.4th at 169.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020).  And, compassionate release is a "rare" remedy.  *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

As noted, even if the defendant establishes an extraordinary and compelling reason that renders his eligible for a sentence reduction, the court must consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the

sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187.  But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167.  And, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190).

### III.    COVID-19[3]

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[4]  COVID-19 spawned "a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).

---

[3] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[4] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

People who are stricken with the coronavirus sometimes experience only mild or moderate symptoms.  But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S. COVID deaths after losing political battles*, REUTERS (May 12, 2022), https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/. And, as of October 19, 2022, COVID-19 has infected more than 97 million Americans.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed August 23, 2022).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic.  *Id.*  That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").

For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.  The judiciary, too, faced many operational challenges.  Indeed, the

pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus. The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16. But, the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. In September 2022, it updated its guidance to reflect the most available data. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (September 2, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and possibly hypertension; HIV; being immunocompromised; liver disease; obesity, where the BMI is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.  Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195.  In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196.  Nevertheless, the Court may consider the CDC's identification of risk factors.

At the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020).  However, social distancing is particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area.").  Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating

to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S.

493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."[5]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

---

[5] In June 2020, the *New York Times* reported that cases of COVID-19 had "soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; On October 29, 2020, the *New York Times* reported that "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Notably, although there is no cure for the virus, medical treatments have continued to improve.  And, significantly, we have seen the rollout of four vaccines for COVID-19 (Pfizer, Moderna, Johnson & Johnson, and Novavax).  *See* Rebecca Robbins and Carl Zimmer, *A fourth COVID vaccine is cleared for use in the United States.*, N.Y. TIMES (July 20, 2022), https://www.nytimes.com/2022/07/19/health/cdc-novavax-covid-vaccine.html.   Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first

responders.  But, the criteria for eligibility has since been approved for all persons six months of age and older.  *See* Rhitu Chatterjee, *CDC clears the way for vaccinations for children 6 months to 5 years old*, NPR (June 18, 2022), https://www.npr.org/sections/health-shots/2022/06/18/1105929247/vaccinations-for-children-6-months-to-5-years-old-can-begin-after-cdc-clears-the.

As of October 2022, approximately 68% of the total U.S. population is fully vaccinated, including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 74% of people from ages 18 to 64, and 93% of people age 65 and up.  *See How Vaccinations Are Going in Your County and State*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last updated October 20, 2022).  Moreover, approximately 107.5 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older.  *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated October 4, 2022).  And, federal regulators approved a second and third booster dose for individuals age 50 and older as well as those at higher risk.  *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.

Additionally, on September 1, 2022, the CDC recommended updated COVID-19 boosters from Pfizer-BioNTech for people ages 12 years and older and from Moderna for people ages 18 years and older.  *CDC Recommends the First Updated COVID-19 Booster*, CTRS. FOR DISEASE CONTROL (Sept. 1, 2022), https://www.cdc.gov/media/releases/2022/s0901-covid-19-booster.html

On January 4, 2021, at about the time of the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance." *See COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. It provides that administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of October 6, 2022, the BOP had 143,064 federal inmates and approximately 36,000 staff. And, by that date, the BOP had administered 330,593 vaccine doses to staff and inmates. *See* Bureau of Prisons, https://www.bop.gov/coronavirus/ (last accessed October 6, 2022).

COVID-19 has, in a sense, become a fact of life. *See* Mitch Smith and Julie Bosman, *Covid Deaths Surge Across a Weary America as a Once-Hopeful Summer Ends*, N.Y. Times, Sept. 5, 2021, https://www.nytimes.com/2021/09/05/us/covid-surge-united-states.html ("[T]he coronavirus is going to remain a fact of American life for the foreseeable future."). For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. Times, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region."). But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent than earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants"); *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, sparking concern because it was highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021). Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases. *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

But, the number of COVID-19 cases again declined. *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST (Feb. 7, 2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-

updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y.   And, the country began to return to normalcy.

Unfortunately, we soon experienced another surge in COVID-19 cases.  *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html.   In particular, in the spring of 2022 a new subvariant of the virus began "spreading rapidly" and soon became "the dominant form of the virus . . . ."   *See* Isabella Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases.   As of July 2022, the BA.5 variant of COVID-19, an "offshoot of the Omicron variant," was "spreading quickly," buttressed by an increased ability to overcome "some of the immune defenses acquired by vaccinated people, or those infected by earlier variants."   Ed Yong, *Is BA.5 the 'Reinfection Wave'?*, THE ATLANTIC (July 11, 2022), https://www.theatlantic.com/health/archive/2022/07/ba5-omicron-variant-covid-surge-immunity-reinfection/670485/.   But, the variant then seemed to subside.  *See COVID Data Tracker: Variant Proportions*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker/#variant-proportions (last updated Nov. 12, 2022).

In an interview on the CBS television show "60 Minutes", President Biden claimed that the pandemic is "over" in the United States.  Alexander Tin, *Biden says Covid-19 pandemic is "over" in U.S.*, CBS NEWS (Sept. 19, 2022).  He stated: "The pandemic is over. We still have a problem with COVID. We're still doing a lotta work on it. . . . But the pandemic is over." *Id*.  On the other hand, news reports suggest that we may experience yet another surge of cases in the coming months.  *See*, *e.g.*, *Quick and stealthy 'Scrabble variants' are poised to drive a winter*

*Covid-19 surge*, CBS NEWS (Oct. 20, 2022), https://www.cbsnews.com/baltimore/news/quick-and-stealthy-scrabble-variants-are-poised-to-drive-a-winter-covid-19-surge/.

With respect to the BOP, it has reported, as of November 8, 2022, that 234 federal inmates, out of a total population of 144,519, and 333 BOP staff, out of some 36,000 staff members, currently tested positive for COVID-19.  Moreover, 48,115 inmates and 14,402 staff have recovered from the COVID-19 virus.  In addition, 309 inmates and seven staff members have died from the virus.  The BOP has completed 128,668 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to FCI Cumberland, where the defendant is imprisoned, the BOP reported that as of November 9, 2022, out of a total of 1,211 inmates, five inmates and two staff members have currently tested positive, zero inmates and zero staff members have died of COVID-19, and 363 inmates and 141 staff have recovered at the facility.  In addition, 219 staff members and 1,260 inmates have been inoculated with the vaccine at FCI Cumberland.  *See* https://www.bop.gov/coronavirus/;              BUREAU          OF          PRISONS, https://www.bop.gov/locations/institutions/btf/ (last visited November 9, 2022).

## IV.    Discussion

### A.  Medical Conditions

I first consider whether defendant has presented the Court with an extraordinary and compelling reason for his release.

Boyd contends that he is at an increased risk of severe illness from COVID-19 due to his underlying physical health conditions.  ECF 1278 at 1.  As noted, Boyd claims to suffer from high blood pressure, diabetes, and obesity.  But, Boyd's medical records do not indicate that he suffers from diabetes.  On the other hand, the records reflect that he has been diagnosed with HIV.  *See*

22

ECF 1302-5 at 5.  And, the CDC identifies obesity, hypertension, and HIV as risk factors for a more serious case of COVID-19.  *People with Certain Medical Conditions*, *supra*.

Boyd has a body mass a body mass index ("BMI") of over 30.  This qualifies him as obese under the CDC guidelines.  ECF 1302 at 22.  Some courts have found that obesity, or even borderline obesity, can serve as a basis for compassionate release, particularly when coupled with other chronic medical conditions.  *See United States v. Readus*, No. 16-20827-1, 2020 WL 2572280, at *3 (E.D. Mich. May 21, 2020) ("Courts have found that the combination of prediabetes and obesity have been sufficient to warrant release"); *see also, e.g.*, *United States v. Smith*, 538 F. Supp. 3d 990, 995 (E.D. Cal. 2021) ("Many courts have also found that people who have a body mass index within the ranges defined as 'overweight' or 'obese' are at greater risk of severe COVID-19."); *Williams*, 2020 WL 3073320, at *1 (finding defendant with a BMI of 32.5 was obese and qualified for compassionate release given COVID-19); *United States v. Hilow*, No. 15-170-JD, 2020 WL 2851086, at *4 (D. N.H. June 2, 2020) (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Zuckerman*, 451 F. Supp. 3d 329, 335 (S.D.N.Y. 2020) (finding defendant's age, diabetes, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Ullings*, 1:10-CR-00406, 2020 WL 2394096, at *4 (N.D. Ga. May 12, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Foreman*, 3:19-CR-62 (VAB), 2020 WL 2315908, at *4 (D. Conn. May 11, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Quintero*, 08-CR-6007L, 2020 WL 2175171, at *1 (W.D.N.Y. May 6, 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension satisfied an extraordinary and

compelling reason); *United States v. Dawson*, No. 18-40085, 2020 WL 1812270, at *7 (D. Kan. Apr. 9, 2020) (granting compassionate release based on a defendant's obesity).

Moreover, as noted earlier, the "risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*. Numerous judges have found extraordinary and compelling circumstances for defendants with multiple chronic medical conditions, such as those applicable to Boyd. *See, e.g.*, *United States v. Azianbidji*, PWG-17-253, 2021 WL 307416, at *1 (D. Md. Jan. 29, 2021) (defendant with hyperlipidemia, hypertension, and obesity); *United States v. White*, CCB-09-369, 2020 WL 3960830, at *2-3 (D. Md. July 10, 2020) (defendant with neutropenia, hyperlipidemia, hypertension, heart disease, chronic kidney disease, and obesity); *Hilow*, 2020 WL 2851086, at *4 (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Quintero*, 458 F. Supp. 3d 130, 132 (W.D.N.Y. 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension constituted an extraordinary and compelling reason); *United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020) (concluding that defendant's diabetes, hypertension, obesity, and age satisfied extraordinary and compelling reason). There are also some cases in which courts have found extraordinary and compelling circumstances when hypertension is the sole condition. *See, e.g.*, *United States v. Salvagno*, 456 F. Supp. 3d 420, 423, 427-29 (N.D.N.Y. 2020); *United States v. Sawicz*, 453 F. Supp. 3d 601, 604-05 (E.D.N.Y. 2020).

In any event, the defendant is HIV-positive, and the CDC plainly lists HIV as a condition that can make it more likely for one to become severely ill from COVID-19. *People with Certain Medical Conditions*, *supra*. Boyd appears to be on medication for his HIV. ECF 1302-5 at 1.

And, based on defendant's medical records, his HIV is "asymptomatic," and he has "never had an HIV-related illness." *Id*. at 2.

Some courts have found that when an inmate's HIV is adequately managed, status as HIV positive does not provide grounds for compassionate release. *See, e.g.*, *United States v. Richardson*, No. 5:18-cr-00291, 2021 WL 1526431, at *4 (E.D. Pa. Apr. 19, 2021) (denying compassionate release when HIV was well-controlled and defendant was asymptomatic); *United States v. Jackson*, No. 8:09-cr-478-VMC, 2021 WL 1293572, at *2 (M.D. Fla. Apr. 7, 2021) (denying compassionate release when defendant's HIV was asymptomatic); *United States v. Mathis*, No. 2:07-cr-266, 2021 WL 1099594, at *3 (S.D. Ohio Mar. 23, 2021) (denying compassionate release when HIV is effectively being treated); *United States v. Esmond*, No. 18-15 (SDW), 2020 WL 4915669, at *2-3 (D.N.J. Aug. 21, 2020) (denying compassionate release when HIV effectively treated defendant was asymptomatic).

But, as I see it, the fact that Boyd's HIV condition is being managed does not diminish its significance, especially in light of defendant's elevated BMI. *See, e.g.*, *United States v. Ayala-Pizarro*, CCB-13-407, 2021 WL 1265233, at *2 (D. Md. Apr. 6, 2021) (defendant's status as HIV-positive and obese constituted extraordinary and compelling circumstances, although the Government did not contest this); *Bruno v. United States*, 472 F. Supp. 3d 279, 283-84 (E.D. Va. 2020) (granting compassionate release for HIV-positive status and mental health conditions because of continuing risk).

The government does not contest that defendant's medical conditions, generally speaking, render him more vulnerable to COVID-19. Rather, the government indicates that Boyd cannot be considered at risk from COVID-19 because he has been vaccinated and also because he already contracted the coronavirus and recovered from it. ECF 1302 at 24, 31.

25

The Court does not accept the government's argument that vaccination generally obviates the need for compassionate release.  It is without question that the COVID-19 vaccines have been useful in reducing the health risks posed by the coronavirus.  But, they are not entirely effective, particularly as to the latest variants.  "The variants have shown a remarkable ability to get around the protection offered by infection and vaccination."  Carla K. Johnson, *Experts decry little action as COVID-19 cases surge*, Balt. Sun (July 14, 2022).

As Judge Grimm said in *United States v. Palmer*, PWG-13-623, 2021 WL 3212586, at *3 (D. Md. July 29, 2021): "It is impossible to predict the impact of the vaccines on future strains of the virus, just as it is impossible to predict the impact of COVID-19 on [defendant's] specific medical issues."  Therefore, the fact of vaccination or prior infection does not eliminate concerns about underlying health conditions that might otherwise render an individual eligible for compassionate release.  Accordingly, the fact that Boyd has been vaccinated against COVID-19 "does not negate that his underlying health conditions make him eligible for compassionate release." *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021).

As illustrated above, the future trajectory of the COVID-19 pandemic is anything but predictable.  In particular, the Court is mindful that the CDC has confirmed that breakthrough infections of COVID-19 among vaccinated individuals occur and, albeit in rare cases, they can result in death. *See Rates of COVID-19 Cases and Death by Vaccination Status*, CTRS. FOR DISEASE CONTROL & PREVENTION, Mar. 17, 2022, https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status (last accessed May 11, 2022).  Indeed, a recent analysis of "nationwide data from the Center for Disease Control and Prevention" revealed that "[t]he vaccinated made up 42 percent of fatalities in January and February [of 2022,] during the highly

contagious omicron variant's surge, compared with 23 percent of the dead in September, the peak of the delta wave."  Fenit Nirappil & Dan Keating, *Covid deaths no longer overwhelmingly among the unvaccinated as toll on elderly grows*, Wash. Post (Apr. 29, 2022), https://www.washingtonpost.com/health/2022/04/29/covid-deaths-unvaccinated-boosters/.

To that end, the CDC issued recommendations encouraging everyone ages 12 years and older to receive one COVID-19 booster shot after completing their primary COVID-19 vaccination series.  *See COVID-19 Vaccine Boosters*, Ctrs. For Disease Control, https://bit.ly/3MdQMM6 (last updated August 23, 2022).  Moreover, all adults ages 50 years and older are eligible for a second booster shot.  *See id.*  And, the parties have not presented the Court with any evidence regarding whether defendant has received a booster.

Further, several judges of this Court have concluded that an inmate is eligible for compassionate release, notwithstanding his vaccination status.  *See e.g.*, *United States v. Hegie*, RDB-14-411, 2022 WL 605383, at *2 (D. Md. Mar. 1, 2022) (finding that, in light of the COVID-19 pandemic, a fully vaccinated defendant who suffered from obesity and asthma presented an extraordinary and compelling reason for his release); *United States v. Coleman*, PWG-17-393, WL 356724, at *3 (D. Md. Feb. 7, 2022) (determining that, in light of the dynamic nature of the COVID-19 pandemic and the absence of any information concerning the inmate's vaccination status, defendant's underlying medical conditions qualified as an extraordinary and compelling reason for his release); *United States v. Rivas*, TDC-19-0417, 2022 WL 36941, at *2 (D. Md. Jan. 4, 2022) (explaining that vaccinated defendant who was a paraplegic and suffered from frequent urinary tract infections could satisfy the extraordinary and compelling prong of the analysis).

"At the end of the day, district judges are not epidemiologists."  *United States v. Sherrod*, 19-20139, 2021 WL 3473236, at *5 (E.D. Mich. Aug. 6, 2021).  In light of the evolving circumstances

regarding COVID-19, coupled with defendant's medical issues, I conclude that Boyd's vaccination status does not render him ineligible for compassionate release. *See Palmer*, 2021 WL 3212586, at *3 (noting that it is not possible "to predict the impact of the vaccines on future strains of the virus . . . .").

Additionally, a defendant's eligibility for compassionate release is not defeated because a defendant has had COVID-19. What Judge Chuang said in *United States v. Fletcher*, TDC-05-0179, 2020 WL 3972142, at *3 (D. Md. July 13, 2020), is apt: "Although [the defendant] may now be less vulnerable or immune from coronavirus, there is no certainty about whether individuals who have already had COVID-19 now have immunity." *See also United States v. Heyward*, PWG-17-0527, 2020 WL 3547018, at *2 (D. Md. June 30, 2020) (noting in grant of compassionate release to individual who had survived the virus "that a secondary contraction of COVID-19 is possible").

Therefore, I conclude that defendant's multiple health conditions render him eligible for compassionate release. *See United States v. Carter*, CCB-16-235, 2021 WL 3725425, at *2 (D. Md. Aug. 20, 2021) (granting compassionate release to a vaccinated defendant who was obese and suffered from hypertension and Hodgkin Lymphoma). That determination does not end the inquiry, however.

## B.  Section 3553(a) Factors

The coronavirus is not "tantamount to a 'get out of jail free' card." *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.). Even when, as here, a court finds extraordinary and compelling reasons for compassionate release, relief is warranted under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of factors set forth in 18 U.S.C. § 3553(a). *See High*, 997 F.3d at 186; *see also United States v. Butts*, 2021 WL 3929349,

at *2 (4th Cir. Sept. 2, 2021) (per curiam).  These factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.  *High*, 997 F.3d at 186.  The Court must also consider the factors set forth in 18 U.S.C. § 3142(g), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the danger that release would pose to any person or the community.  U.S.S.G. § 1B1.13(2).

In my view, a balancing of the § 3553(a) factors readily indicates that defendant's release from prison is not warranted at this time.

As the government observes, Boyd's crime of conviction was a serious one.  During a DEA wiretap investigation, several calls and texts were intercepted involving the defendant that included discussions of making crack cocaine and the purchase of drugs for distribution.  ECF 1302 at 34. And, the Stipulated Statement of Facts set forth in the Plea Agreement established that the defendant took part in a conspiracy to distribute at least 500 grams of cocaine over the course of the investigation.  ECF 688 at 9.

Furthermore, defendant's criminal history is substantial and reveals a serious pattern of recidivism, dating to when the defendant was just 14 years old.  ECF 788, ¶ 25.  Moreover, Boyd has thirteen adult convictions for drug offenses.  For one, he received a sentence of eight years incarceration in 2003 (*id.* ¶ 34) and for another, he received a sentence of seven years in 2004.  *Id.* ¶ 36.  He was paroled for both offenses in May 2005.  *Id.* ¶¶ 34, 36.  Yet, he violated his parole.

*Id.* In 2018, he received a ten-year sentence for another felony drug offense, with all but one day suspended. *Id.* ¶ 43.

Despite a significant number of criminal convictions and sentences, a review of Boyd's criminal history makes plain that the criminal justice system has repeatedly treated defendant with great leniency. *See id.*, ¶¶ 28-43. Yet, that did not lead Boyd to change his conduct; he continued to engage in criminal activity, which culminated in his federal prosecution in this case. And, defendant committed the offense at issue here while on probation. Notably, although defendant was backing up ten years, that did not deter him from engaging in the drug conspiracy at issue here.

Moreover, the C plea was tendered during the pandemic. Although the Court was not privy to the plea discussions, the parties were well aware of COVID-19 and it seems likely that they would have taken it into account in reaching the agreed-upon sentence. It is also noteworthy that Boyd has only served about 50% of the sentence that this Court imposed for his role in a wide-ranging drug-trafficking conspiracy.

In his Motion, Boyd notes that he has "a remarkable record of rehabilitation and programming." ECF 1278 at 3. The Court applauds Boyd for his positive efforts to return to society. But, "rehabilitation alone cannot serve as a basis for compassionate release." *Davis*, 2022 WL 127900, at *1. In my view, a reduction in the length of the sentence would not adequately reflect the seriousness of the defendant's crime nor promote respect for the rule of law.

## V.    Conclusion

The § 3553(a) factors militate against Boyd's immediate release. In sum, the Court remains troubled by the serious nature of defendant's offense of conviction and Boyd's criminal history,

reflecting his repeated failure to conform his conduct to societal expectations.  The Court is also mindful of the abbreviated duration of incarceration.

These considerations compel me to deny the Motion, without prejudice.  Simply put, this is not the "grievous case[]" warranting compassionate relief.  *McCoy*, 981 F.3d at 287.

An Order follows, consistent with this Memorandum Opinion.


Date: November 16, 2022                      _____/s/_____
                                            Ellen L.  Hollander
                                            United States District Judge